Filed 12/22/14  P. v. Quinonez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B248569 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA118141) |
| v. | |
| BYRON QUINONEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dewey L. Falcone and Michael A. Cowell, Judges.  Affirmed.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, State Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

_____

### INTRODUCTION

At trial, Byron Quinonez was convicted of first degree murder, with firearm and gang allegations found true. The trial court sentenced him to state prison for a term of 50 years to life. Quinonez appeals, claiming error relating to one line of a Spanish-to-English translation of his victim's recorded statements to a police officer before she died from her injuries. More particularly, he argues he is entitled to reversal of his conviction because the trial court (1) failed to properly instruct the jury as to its duties when receiving a transcript of an audio recording containing a foreign language translation; (2) failed to exercise its discretion to reopen the trial sua sponte when the jury identified a translation error; (3) as an alternative to reopening the trial, failed to declare a mistrial when jurors' identification of a translation error necessarily established juror misconduct; (4) exerted undue pressure for a verdict and effectively directed a guilty verdict when the court reprimanded the jury to accept the provided translation; (5) abused its discretion in denying the defense motion for new trial based on the defense's production of a corrected translation as new evidence; and (6) deprived him of a fair trial when it denied the new trial motion based on the court's reliance on an incorrect translation. Because Quinonez has failed to identify any prejudicial error, we affirm.

### FACTUAL AND PROCEDURAL SUMMARY

*Prosecution Evidence.*

*Yolanda C.*

During the evening hours of November 11, 2010, Byron Quinonez, a Florencia 13 gang member, and his 14-year-old girlfriend Yolanda C. left home and went to the park to hang out and smoke marijuana.[1] Quinonez talked with Yolanda about stealing a car—not any particular car—and selling it; she agreed. She knew he had a gun "on him." They walked to the El Saloon bar and waited outside.

---

[1]    Yolanda C. had been living with Quinonez and his family.

2

Shortly after 2:00 a.m. (November 12), Rosa Enriquez and her co-worker (Nadiezda Ann Schopp) left the El Saloon bar in South Gate and walked to their cars.[2]

Yolanda watched as Quinonez approached Enriquez but could not hear what he said. He told her later that he had asked the woman to give Yolanda and him a ride. At first, she said, "No," but then agreed. Yolanda and Quinonez both sat in the back, with Quinonez on the right and Yolanda in the middle, while Enriquez drove. There was no one else in the car.

Yolanda was talking with the woman about a man she (Enriquez) had dated and her children when she heard Quinonez say, "I'm sorry," to the woman and then heard gunshots. Yolanda "stayed stuck . . . sitting there," watching as Quinonez shot Enriquez. After the first shot, Yolanda said she "blacked out[,] . . . went into shock." Enriquez opened her door and tried to get out of the car. "She just asked[,] 'Why?'" With the car still moving slowly, Quinonez got out and came around to the driver's side; when Enriquez was out of the car, Quinonez got in and drove to an alley where he parked. Neither Quinonez nor Yolanda spoke. "All [Yolanda] remember[ed was Quinonez] was driving." He had not said anything to her about shooting the woman; he just said they were looking for a car to steal. They took some papers and a bag containing a purse, clothes and shoes from the car and walked home.

*Enriquez's Dying Declaration to Officer Perez.*

Meanwhile, at about 2:20 a.m., responding to 9-1-1 calls reporting shots fired and a woman down in the middle of the street, South Gate Police Officer Christian Perez arrived to find the Enriquez lying in the middle of the street with gunshots to her chest and shattered glass and blood in the street surrounding her. He immediately turned on a recorder he carried with him and attempted to get a statement from her. Officer Perez asked (in English): "Female or male?" Enriquez responded, "It was a man, it was a man

---

[2]    Schopp knew Enriquez as "Maria."

3

[as translated from Spanish to English]."[3]  Fluent in Spanish himself, Officer Perez continued to speak with Enriquez in Spanish, and she responded primarily in Spanish but also in English at times.  She provided a description of her vehicle (a black 2005 Infiniti) before calling out, "Oh my God [in English].  I'm dying [as translated from Spanish]."  After that, she told Officer Perez, "They didn't have a car" and said "they" had been "on foot."  She did not know their names.  "They just asked me for a ride. . . .  They don't know me."  "They shot me . . . ."[4]

*Quinonez's Disposal of Evidence and the Police Investigation.*

When Yolanda and Quinonez got home, Yolanda put Enriquez's shoes in Quinonez's room and washed their clothes.  He took a shower; she went to sleep.  At some point after that, Quinonez left.  He came back later that morning to pick up Yolanda in Enriquez's car, and they drove to a self-service carwash where they washed the inside and outside of the car.  After cleaning the car, Quinonez drove to a park and put everything that was left in the car into a trash can.  Yolanda saw Quinonez meet with someone there for about five minutes.  She saw Quinonez give the car keys "to some tweaker in the park."  When she and Quinonez left, Yolanda saw the contents of the trash can were on fire.[5]

Los Angeles County Sheriff's Department Detective Gary Sloan obtained Enriquez's cell phone records.  He found that her phone had been used to make several

---

[3]     As we will discuss, a second court-certified interpreter later translated this line as "A man and a woman!"

[4]     Enriquez died as the result of her multiple gunshot wounds.

[5]     While on patrol, a City of South Gate police officer (David Kochmanski) saw the fire burning in the trash can next to a black Infiniti SUV with a shattered driver-side window, ran the car's license plate and learned it had been involved in a carjacking so he set up a crime scene around it.

phone calls about an hour after the shooting which, under the circumstances, led him to believe the person using her cell phone was the same person responsible for shooting Enriquez. Detective Sloan then spoke with the individuals whose telephone numbers had been called from Enriquez's phone after the shooting, and talking to those individuals led to Quinonez.

Officers conducted surveillance, obtained a warrant and detained Quinonez and Yolanda near Quinonez's house. They were placed together in a police van. Quinonez told Yolanda he was sorry and that "he would take it." Yolanda told Quinonez "not to worry, that [she] w[as]n't going to say anything about what had happened."

Evidence recovered from Quinonez's bedroom included women's dress shoes and a computer. A number of gang-related photographs were retrieved from Quinonez's computer—one in which he made a hand gesture, "throwing up an 'F' for 'Florencia.'"

*Quinonez's Interview.*

Detectives Sloan and Perry interviewed Quinonez in January 2011. Quinonez (then 20) admitted he was a validated Florencia gang member going by the name of "Deps." He said the name "Deps" meant "[f]rom the depths of hell" and said he had gotten the name "[be]cause [of ]the way I fight." Quinonez said he had been "jumped in" six or seven months earlier.

He lived with his parents, a sister and a brother and, for about a month and a half, his girlfriend Yolanda. He met her when he got out of County jail, and he had been seeing her for about three months. (He said he had thought she was 17 although the other officers had told him she was 14.) Initially, Quinonez said he did not know anything about a murder; he said he thought he had been brought in for "another warrant" as he had been arrested "a bunch of times for knives and shit."

In investigating the case, Detective Perry told Quinonez, they had talked to a lot of people and had collected a lot of evidence—videos from businesses, fingerprints, DNA,

5

gunshot residue (GSR), hair, blood spatter, cell phone records and more.[6] Detective Perry said there was a lot they already knew, other things they were "about 90 [percent]" sure of, and still other things they wanted to talk with Quinonez about, but they would not tell him everything they knew and he should not agree with or say no to everything. "You need to be 100 [percent] truthful." He would not know whether the detectives did or did not know the answer to a question because part of what they were doing was finding out "what kind of man you are." They would give him respect and expected the same in return. Detective Perry told Quinonez they had had spent a lot of time talking with Yolanda, and Quinonez asked, "Is she okay?" Detective Perry said she was hurting emotionally. Quinonez said he knew about her life, as much as he could get from her, and "that's messed up." The detective said he probably saw in Yolanda what Quinonez saw—"very nice girl, pretty smart," but "she has gotten a raw deal in life so far and that continues through today with what happened in the case we are investigating" because "she was somewhere, somebody did something and now. . . [s]he's one of the people that's going to pay the price" along with him (Quinonez). Detective Perry asked Quinonez whether he was going to "have Yolanda go down for this[.]" Detective Sloan said, "He's not gonna give her a chance, 14-year-old girl, you're not gonna give her a chance?" When Quinonez asked what chance she could have since the detectives said she was also going down for murder, Detective Perry told him he could "paint a picture" as to her role and they could go to the District Attorney and say he had said her role was actually "nothing" and she did not even know that it was going to happen. Otherwise, Detective Sloan told Quinonez, "come Monday this little girl is never ever going to leave jail again. . . ." Quinonez then asked, "Let's say I was to say that. What difference does it make?" The detectives told Quinonez it would make a "huge difference" for Yolanda-- "all the difference in the world."

---

[6]     At trial, the detective acknowledged he did not have all of this evidence, but such statements were a permissible "ruse" to get Quinonez to talk.

Detective Perry said he "need[ed Quinonez] not to be selfish" because this was "about a girl who had absolutely no parents," a girl who could be given a chance. "[T]hink about her. Just like you said in the van, 'baby if it gets to that, I'll take it.'" Detective Perry told Quinonez to explain what happened "for Yolanda's sake." Detective Sloan told him to "give her a life, give her a chance right now."

The detective told Quinonez the evidence led them to his door, but the question left was what was "what was going on inside [his] head." On the outside, it looked like a "stone-ass killing" so if it was something different, that would have to come from Quinonez. What he had intended to happen made a difference in the law. The detective urged him "not [to] tak[e] the mindset of I can't say anything" because nobody else would go to jail for him. Detective Perry told Quinonez he wanted him to "be honest and truthful." Detective Perry showed Quinonez a picture of Enriquez and asked him if he recognized her. "Don't lie to me."

Quinonez said he knew who she was—he knew her as "Maria" from the Saloon—because he knew the bar's owner Arturo. Quinonez said he and another guy named Marcos used to make sure nobody parked in the parking lot without going to the bar, and Enriquez brought food out to them a couple of times. Detective Perry said, "She used to date him? Yeah. Do you know how big this is[?] Now you see when you mentioned Marcos and I say she used to date him. . . . [T]hese are questions that I'm gonna ask you that I know the answer[s] to and you damn well better not lie to me about it."

Quinonez acknowledged Marcos had been "seeing" Enriquez but said "he didn't talk to her when [Quinonez] was right there . . . ." Quinonez said he "sold shit" with Marcos—"weed, meth"—and said he "smoke[d] a little weed" and "did meth" too. Detective Perry asked what kind of car Enriquez had, and Quinonez said it was an Infiniti truck. Quinonez said he had not seen Enriquez since the week he got out of jail.

Detective Perry told Quinonez he knew Quinonez had used Enriquez's phone to make several calls after she was dead, and he could prove it. Detective Perry asked

7

Quinonez if what had happened had been "ordered" as "a hit." Then he said "nodding is cool but I don't want to put words in your mouth." In response, Quinonez said, "All I ask is to keep an eye on my house, you know?"

Quinonez said he had been "sent on a mission"—a "suicide mission"—to kill Enriquez because she was "trying to . . . [t]alk." She had snitched on somebody and there was "paperwork" on her. Quinonez said he was given a gun for the mission, and he had to be the one to ask her for a ride. "[I]t had to be me . . . . They know I have some kind of connection to her." He said Yolanda did not know he was "going on a mission" until it happened.

The detectives told Quinonez Enriquez was alive for about two hours after she was shot and was able to speak for at least one of those hours. He said, "I know." Detective Perry said you don't know what she told us. He said, "I know."

At the time of the shooting, Quinonez said, he and Yolanda waited outside the bar until the woman he recognized as "Maria" (Enriquez) came out. He said he approached her, asking for a ride to a motel, and she agreed. He and Yolanda got in and he sat on the right rear passenger side with Yolanda just to his left. There was some brief conversation during the drive, Quinonez said, but then he opened the window "so the air could come in and [make] noise," pulled out the gun he had in his right front pocket, slowly pulled back the slide to chamber a round, told Enriquez in Spanish, "I'm sorry. Please forgive me[,]" and shot what he believed to be three rounds. He said he "looked at her in the mirror" and "told her in Spanish 'perdoneme.' . . . I just asked her to forgive me for this. I know she won't, you know, but-- . . . [b]ecause she wouldn't understand the situation I was in." She turned back and just said, "Que?" He described how he reached across his body toward her from a distance of about 18 to 24 inches and closed his eyes. She "made

8

[him] want like not [to] do it, but at that point[,] it was already . . . bullets shooting." He described how she opened the car door. He didn't know she "didn't die right away[.]"

He said he had burned his clothes as he had been told to do when he picked up the gun. He handed the gun off to someone of a "higher rank" and said "that shit is no good, just get rid of it." He said he did not know the police had the gun he had used (or that "it matched up perfectly" to the bullets in Enriquez's car door) or that two people had been arrested with it. He used Enriquez's phone because his was dead. At that point, the detectives noted his body language and said they could tell he was starting to feel a little better because he had finally gotten to talk to somebody about what happened.

Continuing on, Quinonez told the detectives Yolanda slept that night but he did not. The next morning, Quinonez said, he told Yolanda, "I had to do it because my life and everybody's life depended on this type of shit . . . ." He said there was nothing that could be done; he "didn't have a choice." While he was in jail for a different offense, people came to his house and shot at his father when he was "just standing in front of the house." The people who shot at his father were "after [Quinonez]." He said his dad got shot at while he was in jail, and he was given the job when he got out because "[his] name supposedly came up on the list."

Quinonez said he had heard from other people "the word was that I was informing—that I was cooperating with the cops. I got pulled over one time and they seen me talking to them . . . . I had a real conversation with [a police officer]." Quinonez said he had been taken to the station on a terrorist threats charge, but the lady dropped the charges and he got out the next day, but someone else he knew from Florencia who lived down the street from him was arrested on a search warrant so then "[t]hat's the word and ain't nothing going to change that . . . ." He said he had heard, "They're going to come to my house, try to get me in there . . . ."

Quinonez said Marcos was "close" during the shooting, "[w]here [Quinonez] went to drop off the car." He had to bring the car and "show that it's done." He said he was

9

"just really honestly trying to watch out what I say. . . . Because I don't want nothing happening to me while I--" "I had to be off of that list." Quinonez said it was a "hit"—he was not paid to do it; "it was just my life." He was told he had until the end of the month. The detectives challenged Quinonez's account and his claim that he had "no choice" several times throughout the interview, saying it sounded "like TV," but Quinonez "sw[o]r[e] it was a hit," insisting he had "to do this deed or [he was] going to get done." He reiterated, "It was all about a hit.. . . . I put that on everything I love . . . ." He said it was "hard . . . to . . . deci[de] what to do, other than to do what I was told to do to save my own life. I wanted to keep on, you know, I met this girl, I wanted to keep on living with her, you know, I wanted to keep on building something, you know. I didn't want to die right there, so of course I was going to do what I had to do. . . . [T]hat's why I shot the lady."

At the end of his interview, Quinonez asked the detectives what would happen to Yolanda: "And please like—please don't try to trick her into saying—having to point me out because that's going to make it all bad for her." He asked the detectives to "tell her that I love her."

Quinonez was charged with murder (Pen. Code § 187 [all further undesignated statutory references are to the Penal Code]), with accompanying gang and firearm allegations. (§§ 186.22, subd. (b)(1)(C); 12022.53, subds. (b)-(d).)

At trial, the People presented evidence of the facts summarized above. In addition to three brief "clips" from the recording of Enriquez's statements to Officer Perez, the audio of Quinonez's police interview was played for the jury (with a transcript provided). The interview lasted 2 hours and 47 minutes.

At trial, Yolanda also testified that, at some point between the shooting and their arrest (in January 2011), Quinonez told her "he didn't want to do it" but said "it was a matter of that or his family." She told the police Quinonez told her "he did this because she [the victim] had something to do with some other business because of something she

10

was involved in." Yolanda acknowledged that, as part of a plea agreement in connection with this case, she was serving a seven-year sentence in a juvenile correctional facility for conspiracy to commit a carjacking and possession of stolen property. She loved Quinonez and believed he would do anything for her.

Quinonez stipulated he was a member of the Florencia 13 gang. A Los Angeles County Sheriff's Department gang detective (Dean Camarillo) testified that Florencia 13 is a criminal street gang that claims the territory surrounded by Slauson Avenue to the north, Central Avenue to the west, 92nd Street to the south and as far east as Salt Lake Avenue in Huntington Park. Florencia 13 gang members commonly identify themselves by making hand signs in the shape of a letter "F." In response to a hypothetical tracking the evidence presented, Detective Camarillo opined Enriquez's shooting was done for the benefit of, in association with and at the direction of a criminal street gang. Such an act would demonstrate a gang member's loyalty and willingness to commit any crime requested of him, prove he was not a snitch and enhance his reputation. To be known as a killer within gang culture would make a gang member famous and would place that gang member in higher regard, entitling such a person to benefits in County jail.

Quinonez had written Yolanda letters while he was in jail, expressing his undying love for her. He also wrote: "it's still that effe life for me."[7] In another letter, he wrote: "I was pretty famous when I got here cus [sic] of the news and wat [sic] not. I had no idea I came out on the news and on the newspaper [sic] but I guess I did cus [sic] people in here already knew me. It was a trip, but fuck it, I guess. They take care of me pretty good though."

A criminalist with the Los Angeles County Sheriff's Department (Tracy Peck) examined Enriquez's SUV for bullet holes and other firearms-related evidence. In her inspection of the vehicle's door, she recovered and analyzed four bullets—all damaged in

---

[7]     Detective Sloan explained "effe" means "F" in Spanish, signifying the gang (Florencia).

a manner consistent with having passed through a person. All of them had been fired from a Smith and Wesson in the possession of another Florencia 13 gang member (Jerry Verduzco) at the time of his arrest. She was not able to determine a specific trajectory for all of the bullets, but the trajectory of two of them was right to left, rear to front and downwards. Peck determined that the door was partially open when one of the bullets was fired but did not know the door's exact position at the time; if the door had been halfway open, the bullet's trajectory would have been from the right rear passenger area. She could not say with certainty where the shooter was positioned in the vehicle.

Deputy Medical Examiner Paul Gliniecki performed Enriquez's autopsy. He found Enriquez had sustained five gunshot wounds (one bullet had entered and exited Enriquez's arm before reentering her chest), and the wound trajectory for all of the wounds was right to left, back to front and downward, except for one wound that angled slightly up. Except for one, each of the wounds was potentially fatal standing alone. Four of the wounds had stippling around them which meant Enriquez was shot from a distance of anywhere from half an inch to 24 or 36 inches.

Quinonez presented no evidence in his defense.

The jury convicted Quinonez of murder as charged and found true the gang and firearm allegations.

After denying Quinonez's subsequent motion for new trial, the trial court sentenced Quinonez to state prison for a term of 50 years to life (25 years to life on the murder count plus another 25 years to life for the firearm enhancement). (§ 12022.53, subd. (d).) The trial court stayed sentencing on the remaining enhancements.

Quinonez appeals.

### DISCUSSION

All of Quinonez's arguments on appeal relate to the translation of the recorded exchange between Officer Perez and Quinonez's victim (Rosa Enriquez) as she lay dying in the street from multiple gunshot wounds. According to the transcript reflecting the

12

court-certified Spanish interpreter's translation, in response to Officer Perez's question, "Female or male?" Enriquez responded, "It was a man, it was a man." During deliberations, however, the jury (which included some Spanish speakers) indicated there appeared to be a translation error in this line and that Enriquez had instead indicated "a male and a female." After conferring with counsel, the trial court instructed the jury it had to accept the translation provided by the court-certified interpreter as the trial court had previously instructed. Shortly thereafter, the jury reached its verdict, finding Quinonez guilty as charged and reaching true findings as to the firearm and gang allegations. Later, in connection with his motion for new trial, Quinonez submitted a translation prepared by a different court-certified translator who indicated the disputed line was: "A man and a woman!"

Because he says the issues "share a factual and evidentiary context which would otherwise make the discrepancy appear too innocuous to have affected the outcome," Quinonez argues it is necessary to consider the full procedural history. We agree that each of Quinonez's claims of error must be considered in the proper context of this case and therefore set forth the relevant proceedings below.

*Interpreted Foreign Language Testimony and Transcripts.*

Following opening statements on July 13, 2012 (a Friday), the prosecutor called the People's first witness (Schopp), indicating she required the assistance of the Spanish interpreter.

At that point, the trial court asked, "Do any of you . . . speak Spanish?" According to the record, there was a show of hands.

The trial court then instructed the jury as follows: "Those of you who speak Spanish must accept the interpretation given by a certified interpreter, not put your own spin on what the witness has testified about in Spanish. We have to rely on the court[-]certified interpreter. [¶] Does everybody understand that?" According to the

13

reporter's transcript, the jurors responded in the affirmative, and Schopp then testified through the Spanish interpreter.

On July 16 (a Monday), in connection with Detective Sloan's testimony, the prosecutor played the audio recording of Quinonez's police interview (in English). At that time, the trial court told the jury, "We're going to give you transcripts like we've done before.[8] Keep in mind this is only to assist you this morning. When you go back and deliberate, you will not have those transcripts because that's not evidence. You will only have the actual audio itself that you will be able play if you are inclined to do so."

Later in the day on July 16 (more than three calendar days after Schopp testified through a Spanish interpreter), at the outset of Officer Perez's testimony, the prosecutor indicated she would be playing a portion of a recording (Enriquez's statements which contain the disputed line) and would then ask Officer Perez some questions but first would pass out transcripts.

"For the record, Your Honor, just so the court is aware there'[re] two columns in the transcript. The left-hand column is the Spanish transcription, and the right-hand column is the English translation from a certified Spanish interpreter."

The trial court inquired: "Does that mean that, when that audio goes back into the jury room, it's going to be in Spanish?"

She answered, "Yes."

The trial court responded: "[W]hat we might do then is let the[ jurors] have a copy of the transcript when they go back there. Normally, I don't do that, but I'm not sure—if we have a certified translation, I'll rely upon that and let [Exhibit No.] 33-A [the transcript] go back with the jury."

The jury did not receive any instruction regarding foreign language recordings or any instruction limiting the jury's consideration of the audio recording to the statements

---

8    It appears the trial court's recollection was in error as we find no indication in the record the jury had been provided with transcripts before this time.

14

spoken in English only or limiting consideration of the statements in Spanish to the speaker's apparent tone or demeanor or any other purpose.

The prosecutor then played the first audio excerpt of Enriquez's exchange with Officer Perez which, as we have already described, began as follows:

"Officer: Female or male?

"Radio: Gunshot, uh, ***.

"Rosa: It was a man, it was a man."[9]

Defense counsel had the opportunity to cross-examine Officer Perez and asked whether what he heard on the CD was a "fair and accurate depiction on the written transcript [sic]." Officer Perez responded, "As far as I can tell, yes."

Defense counsel had no further questions and raised no objections.

Later, the prosecution rested its case in chief, subject to the admission of exhibits. Outside the jury's presence, the trial court and counsel reviewed the exhibits. Although defense counsel objected to the admission of some of the exhibits, he raised no objections to the audio recording of Enriquez's statements, the translation or the transcript. Regarding that evidence, the trial court stated: "[B]ecause it's in Spanish and some of our jurors do not speak the language, read the language, I'm going to permit not only [Exhibit No.] 33, the CD or the audio, to go in, but [Exhibit No.] 33-A, the translation." Defense counsel made no objection, responding: "Thank you, Judge."

*Jury Instructions.*

Next, the trial court discussed jury instructions with counsel, identifying by number each of the CALJIC instructions the court intended to give, including CALJIC

---

[9] Again, according to the translation later submitted in support of Quinonez's motion for new trial, another certified Spanish interpreter/translator reported the line as "A man and a woman[.]"

15

Nos. 1.00 (respective duties of judge and jury) and 1.03 (juror forbidden to make any independent investigation). According to the record, defense counsel raised no objections to these instructions and made no requests for modification or amplification. Defense counsel advised the trial court Quinonez would not be testifying.

The trial court then gave the jury three admonitions.[10] Thereafter, the trial court instructed the jury as agreed.

There was no instruction relating to a foreign language recording. Although the trial court had ruled that both the transcript and the audio recording of Enriquez's statements to Officer Perez would be given to the jury, there was no instruction limiting the use of the audio to the English language portions only or any other purpose.

The jury was dismissed for the day at the conclusion of the instructions.

*Closing Arguments.*

The next morning, the prosecutor and defense counsel made their closing arguments.

The prosecutor observed the defense had made two issues out of the case: first, through his cross-examination, defense counsel implied Yolanda could have been the

---

[10] Noting that the jury had heard about warrants issued for Quinonez's arrest, reference to his use of marijuana, time in County jail and possession of knives, the trial court admonished the jury not to consider these "collateral matters" as to the question of whether he had committed the crime with which he was charged.

Next, the trial court admonished the jury: "[W]e heard some testimony regarding Yolanda and her difficulty—her early life difficulty and the allegations that she had been molested when she was about four years old. That was not evidence. There was reference to that. But, again, I want you to keep in mind that that's not relevant to the issue we're dealing with with Mr. Quinonez."

Finally, before reading all of the instructions, the trial court told the jury: "[W]e had that 9[-]1[-]1 [audio], the victim's statement, and that's been synopsized, cut down, and it may seem a little out or sequence or out of sorts, not necessarily logical. But what we do is we pick out what we feel are relevant portions of her statements and take out the rest. So keep all those little matters in mind."

16

shooter; second, the defense claimed Quinonez was threatened and felt he "had to do it" so he was not responsible for what he did to Enriquez. She reviewed the details of Quinonez's own statement to police as well as Yolanda's testimony which, she argued, established Yolanda had not been the shooter. In addition, she argued, "right after [Officer Perez] hit the record button, he specifically asked [Enriquez] was it a man or a woman [a]nd [Enriquez] said in Spanish that it was a man." At that point, the prosecutor replayed the "clip" for the jury, then continued: "So [Enriquez's] own statement is that it was a man that did this to her, not a woman. . . . She's telling the police officer exactly what happened and the gender of the person who had done this to her." She concluded by emphasizing the inconsistency between the two defense theories and reminded the jury how Quinonez told detectives he took the gun out, racked the slide, told Enriquez, "I'm sorry," she looked back and asked "What?" in Spanish, he looked at her for a moment and thought he should not do it, but he did—he shot Enriquez repeatedly.

Defense counsel said the "most important or most compelling evidence that we have is Mr. Quinonez'[s] . . . statement." He emphasized Quinonez the fact Quinonez had told the detectives "it was all about a hit" and then he said: "I put that on everything I love, on everything I love." Quinonez said, "I put it on my mom, I put it on my little brother and everything." Defense counsel then said it was part of the gang "code of conduct," "You don't make this kind of statement unless you're telling the truth." Regarding Yolanda, defense counsel argued several portions of Quinonez's police interview "suggest[ed] Quinonez is taking the rap for her. [¶] If you're not persuaded," defense counsel continued, the evidence Quinonez was under duress and did not want to do it meant his crime was second degree murder.

In her rebuttal, the prosecutor again said the defense "doesn't make any sense." On the one hand, the defense wanted jurors to believe there were "all these threats, and that's why Mr. Quinonez did it. But Yolanda did it." She must have washed the clothes to get rid of GSR, and she sat in the back seat so she could have done it. The prosecutor

17

acknowledged the criminalist's testimony she could not determine exactly where the shooter was. "So in order to make that determination, you're going to have to rely on Yolanda's statement and on Mr. Quinonez's statement and [Enriquez]'s statement. The defense has conveniently not addressed that at all. [Enriquez]'s own words before she passed away was [sic] that it was a man that [sic] shot her, and that completely eliminates the defense's contention that it was in fact Yolanda that did this." The prosecutor concluded by saying the facts were undisputed that Quinonez had taken Enriquez's life to promote his gang.

After the trial court gave two more concluding instructions, the jury began its deliberations at 11:06 a.m. (on July 18, 2012).[11]

*The Jury's Requests and Questions During Deliberations.*

After taking lunch from 12:00 to 1:30 p.m., the jury resumed its deliberations, but at 2:15 p.m., submitted a written request for playback of the audio recording of Officer Perez and Enriquez. According to the court's minute order, "Counsel [we]re contacted and the jury [wa]s provided with equipment for use during audio playback."

---

[11] Outside the jury's presence, the trial court then inquired, "Mr. Manuel [defense counsel] and Ms. Cox [the prosecutor], on readback, advise you merely what the requested readback is, and then waive appearance of both Mr. Quinonez and counsel and let the reporter alone go back and read back the relevant testimony?"

"[Defense counsel]: Yes . . . . And I spoke to Mr. Quinonez, and he agrees to waive his presence."

"The court: And then, if there are any questions or notes, we will advise counsel accordingly.

"[The prosecutor]: Yes, Your Honor. Thank you.

"Defense counsel: Thank you, Judge."

At 2:55 p.m., the jury submitted a written question to the trial court. As stated in the minute order, "Counsel are contacted and written response is submitted to the jury. Jury is once again provided with equipment for use during audio playback.

"At 3:20 p.m., the jury submits a written question to the court. Counsel are contacted and advised to appear in court.

"At 3:34 p.m., the jury is deemed admonished and ordered to return on 07/19/12[] at 9:00 a.m . . . .

"Out of the presence of the jury and the defendant: defendant's presence is waived by counsel. [¶] Court and counsel confer re juror question as fully reflected in the official notes of the court reporter."

According to the record, the trial court and counsel had the following exchange:

"[Trial court]: "All right. There was a question that came out from the jurors. Quote, 'request a translator and audio of Rosa's [Enriquez's] statement to Officer Perez, also a copy of the transcript for each juror,' end of quote.

"I wrote back, 'You were instructed to accept the translation reflected in the transcript. No translator will be provided. Those who speak Spanish must still accept the translation reflected in the transcript.'

"So I told them they must accept it, period. Then I get a note back, 'We believe an error is in the translation,' in spite of what I told them. So they come back and say, quote, 'We believe an error is in the translation from Spanish to English which makes a significant difference in the audio translation of Officer Perez'[s] recording of Rosa [Enriquez]'s statement. This difference could play a major part in our verdict. Page 1, the starting of the audio, line 3, indicates that there is a male and female. Line 3 needs a closer look between audio and written translation.'

"Indicating, I guess, that they say that that line 3 makes reference to a male and female.

"So on the translation, for the record, the translation is the officer asking Ms. Rosa, 'Male or female?'

"Then there's a [']Radio[:] Gunshot.

"Then [']Rosa[:] It was a man, it was a man.' That's in English. To the left is the Spanish, 'Un hombre, era un hombre.'

"Now this had been received in evidence. I've instructed them that they have to accept the translation. So I'm not going to provide another interpreter for additional evidence.

"[Defense counsel]: I don't think you can.

"The court: That's exactly right. I don't think I can. And I will have to instruct them again that, 'You must accept the translation by the certified interpreter.'

"[The prosecutor]: Yes. And I was going to ask the court to maybe insert that language that it was a certified court interpreter that provided the transcription and the translation.

"[Defense counsel]: I don't have any objections; not to that.

"The court: Okay. That's all we can do then. . . . What bothers me is that they ignored my instruction that they had to accept it. [¶] Then I get the last note out saying, there's some—

"[The prosecutor]: Right.

"The court: So I'm going to have to be rather firm in my note, and I might even bring Juror No. 12, who is our foreperson, out and remind him of that importance, that they must accept it. If it's in some fashion wrong someplace down the line, it will be reviewed by whatever reviewing agency is involved.

"[Defense counsel]: Can we go off the record for a minute?

"The court: Sure.

20

After a discussion was held off the record, the trial court stated: "I will bring out the foreperson tomorrow and advise them and instruct them that they must abide by—I'm asking myself should I bring all [12] jurors out? I think I should.

"[The prosecutor]: I think the court should so that they all hear it from you.

"The court: Yes. I think that's what I'll do[] then."

The trial court ordered counsel and Quinonez to appear the following morning at 9:00 a.m.

In the morning, the trial court addressed counsel before bringing in the jury: "It's my intention, based upon the notes I received from the foreperson yesterday, I'm going to bring out the twelve jurors and the two alternate jurors and go over some of the matters with them, and then we'll see what happens after that." Then, once all of the jurors were present (at 9:30), the trial court addressed the jury as follows:

"Yesterday afternoon, the court received a note from the foreperson. And let me read the note. [¶] Quote, 'Request a translator and audio of Rosa's statement to Officer Perez, also a copy of the transcript for each juror,' end of quote.

"When a question or a note comes out from the jury, I discuss what that is with both attorneys, and then I formulate a response thereto based upon my discussion with the attorneys. And I'm going to read my response to you based upon my discussion with the attorneys indicating –they indicate that it was an appropriate response.

"Quote, my response to you: 'You are instructed to accept the translation reflected in the transcript. No translator will be provided. Those who speak Spanish must still accept the translation reflected in the transcript.' And that's what we sent back after my discussion with counsel.

"Now, at that point in time, yesterday when I sent that note back, I want to put things in perspective as to where you people were. First of all, at the time that the audio and the translation of the audio—Rosa's audio, Exhibits 33 and 33-A—were presented to the jurors and before you heard the audio and before you read the transcript, I asked those

21

of you in the jury box whether or not any of you spoke Spanish. And I believe about three or four of you indicated that you did speak Spanish.

"Then I admonished you that we have a translation by a certified court interpreter, and that you are bound to accept that translation given by that interpreter, and you are not to put your own analysis or interpretation of what you hear on the audio, but accept that translation.[12] [¶] In addition, again, when this note went back, I had instructed you on the law, and I want to refresh your memory as to two points of the instructions that I gave you. One instruction was, quote, 'You must base your decision on the facts and the law. You have two duties to perform. First, you must determine what facts have been proved from the evidence received in this trial and not from any other source. A fact is something proved by the evidence.' [¶] Going on with that same instruction, 'You must accept and follow the law that I state to you regardless of whether or not you agree with it.' [(CALJIC No. 1.00.)]

"Then there was another instruction I gave you. Quote, 'You must decide all questions of fact in this case from the evidence received in this trial and not from any other source. When a witness has testified through a certified court interpreter, you must accept the English interpretation of that testimony even if you would have translated the foreign language differently,' end of quote. [(CALJIC No. 1.03.)] [¶] So those are two instructions that are certainly applicable to the issue that you've raised.

"When you heard the audio, I believe it was Tuesday of this week, and followed the audio on the transcript, nobody voiced any opposition, any objection to what they heard on the audio as compared to what they saw in the transcript. So after all that came

---

12      According to the record, the trial court's recollection was in error as the court did not so instruct the jury at the time the audio excerpts of Enriquez's exchange with Officer Perez were played for the jury. It appears the trial court was referring to the court's inquiry as to Spanish speakers on the jury and instruction at the time Schopp testified in court through a certified court interpreter, but there was no transcript involved and no transcript-related instruction given at that time.

22

about and you heard all of the evidence, the evidence was moved to be considered by the jury, and that went back as the evidence.

"Keep in mind—let me go over something else. I want to remind you of your oath. Sometimes we say things to people—and I'm not an exception to the rule—and it kind of goes over their heads. We kind of say, 'Yeah.' Your oath, when you were sworn in as jurors in this case, quote, "Do you and each of you understand and agree that you will well and truly try the cause now pending before this court and a true verdict render according only to the evidence presented to you and the instructions of the court.' [¶] And everybody says, 'I do.'

"Now, this translation is by a certified court interpreter. The Government Code sets out certain regulations as to how an interpreter is certified. They have to have proficiency tests in the language that they are going to translate. Then they take an oath that that they well and truly will translate the language in English and vice versa. They given an oath, and they've taken tests, and they're certified that they're well versed in that language.

"In addition, before that audio was heard by you People and the transcript of the audio given to you People, both sides had a long period of access to that audio and the transcript. And, as a matter of fact, before you heard it, I, with counsel, went over the audio and the transcript, and we redacted certain information. So you only heard and saw what was relevant. But that transcript had been approved by both sides, and that's why it went into evidence. If there was some objection, I would have made a determination, but there was no objection, so that transcript went into evidence. That is the evidence of Rosa's statement, period.

"So what's happening? You're acting contrary to my instructions on the law. You are violating your oath that you gave this court and the attorneys, and, apparently a few of the Spanish-speakers are influencing the non-Spanish-speakers. [¶] Let me go back. After I sent back that note indicating what you're supposed to do, then I get

23

another note from the foreperson. 'We'—I don't know who 'we' are. It must be all twelve. 'We believe there's an error in the translation from Spanish to English which makes a significant difference in the audio translation of Officer Perez.' And I won't go on with what the rest of the statement was.

"So in spite of everything you heard up to the point in time when I sent my note back, then when I sent my note back, 'You're still bound by that transcription,' I get this note back saying, 'We still have a problem.' So the problem has to emanate from my Spanish-speaking jurors, who never said anything before until the evidence was in the jury room, and then they say, 'We have a problem.' [¶] And you say 'we,' Mr. Foreperson. The non-Spanish-speaking jurors don't understand this. They're accepting what the Spanish-speakers are saying they think they heard. I mean, I've got to believe it. [¶] Do you speak Spanish, Foreperson?

"The Foreperson: Absolutely not.

"The Court: All right. So that's my point. It's contrary to your oath. It's contrary to the law. It's contrary to my instructions. You are not following the law. You are bound to accept the translation given by a certified court interpreter period—period. And that's what you're going to have to base your decision on, among the other evidence that you heard. [¶] Anybody have a problem that they can't follow my instructions, that note I sent out, all the information I gave you before the note went out, as well as what I recited this morning? Anybody feel they can't follow my instructions?

"All right. The record will reflect there is no showing of hands. I am going to send my twelve jurors back to the jury room. Continue your deliberations. [¶] My alternate jurors, you may go upstairs, and we will call you if we need you."

At 9:40 a.m. (after hearing from the trial court for about 10 minutes), the jury resumed its deliberations.

Six minutes later, at 9:46 a.m., the trial court was informed the jury had reached a verdict and counsel were contacted.

24

At 10:12 a.m. (on July 19, 2012), with counsel and Quinonez present, the verdict was read. The jury found Quinonez guilty of willful, deliberate and premeditated murder as charged (§ 187, subd. (a)), and found true the firearm (§ 12022.53, subds. (b)-(d)) and gang (§ 186.22, subd. (b)(1(C)) special allegations.[13]

*Defense Request for "Re-review*[ ]*" by an Independent Interpreter or Translator.*

On January 3, 2013, the trial court noted the matter was on calendar for sentencing but at defense counsel's request, the trial court granted another continuance (to February 26). The trial court noted defense counsel had also requested "that the dying declaration of the victim, as given to the jury and as translated by the court certified interpreter, be re-reviewed by an independent interpreter or translator." "[B]ased upon all that was presented during the trial and the rulings I made during the trial," the court (Hon. Dewey Lawes Falcone) denied the request "at this point in time" but indicated "I do invite the Public Defender's office to look into that issue, and perhaps we can discuss it between now and our next hearing." Before concluding the hearing, the trial court added, "[I]t may be a good writ issue. I don't know."[14]

*Motion for New Trial.*

In mid-March, Quinonez filed a motion for new trial on the ground of "newly discovered evidence." (§ 1181, subd. (8).) As an exhibit to his motion, he attached a transcript of a translation by a different court certified interpreter (Evangeline Hernandez) who translated Enriquez's response to the question "Male or female?" as "A man and a woman!" (instead of "It was a man, it was a man."). In opposing the motion, the prosecutor argued defense counsel had not objected or requested a hearing when the jury

---

[13] The jury was polled; all 12 jurors affirmed the verdict. Sentencing was scheduled for September 12, 2012, then continued to November 7 and then again to January 3, 2013.

[14] On February 26, the sentencing date was continued again (to March 28).

25

raised an issue with the translation and the trial court instructed jurors they were to accept the translation by the court certified interpreter as provided to them; in addition, the purportedly "newly discovered" evidence was not diligently procured and was merely contradictory such that a new trial was not warranted.

Quinonez's motion for new trial was not heard by the same trial judge who had presided over Quinonez's trial (Hon. Dewey Lawes Falcone).[15] Defense counsel argued: "[W]hen the jurors have a case and are in deliberation and ask for more evidence because of a purported error in a Spanish translation, is it proper for the court to reopen an evidentiary proceeding. . . . I think that's the question that the Honorable Judge Falcone and I discussed. [¶] . . . [¶] And we never arrived at an answer. [¶] But I think this is what Your Honor is going to answer . . . ."

Then defense counsel asserted: "And so Judge Falcone said I can't open up this proceeding any more. He said I can't start new evidence to come in [sic]."

The trial court (Hon. Michael A. Cowell) inquired: "Did he say I can't or I won't?"

The prosecutor responded: "I respectfully disagree with [defense counsel]'s recollection of events. I do not recall ever the issue of reopening ever coming up at all to address this particular issue. [¶] I remember distinctly having a conversation in open court on the record regarding the interpreter and what sort of response to give to the jury, which we've outlined in our papers. There was no discussion regarding reopening. [¶] And just as an aside, there is case law that does permit a judge under certain circumstances to reopen a case and present evidence even thought the jury's already begun deliberations."

---

[15] According to the minute order dated March 11, 2013, the matter was ordered transferred to a different courtroom (Department SE-N) for sentencing by "order of the supervising site judge." Quinonez's motion for new trial was filed on March 14 and heard on April 24.

Defense counsel then said he was "getting old, kind of ancient, and my memory's not as great as it was. . . . I'm not doubting [the prosecutor]'s memory, whose is probably better than mine, but I don't think we put anything on the record. I think this is when we were addressing the juror's questions. [¶] And after the first one, that they wanted a different interpreter, we kind of shrugged it off, like well we can't do that. We can't reopen now when they are deliberating. But when the second one came around we talked about this, and I think [the prosecutor] is correct, it wasn't put on the record about our conversations. [¶] But Judge Falcone, I remember asking him what can we do, can we reopen? And Judge Falcone was saying [']I'm not going to reopen.['] [¶] . . . I'm not saying [the prosecutor] is not correct. But I recall him telling me I'm going to bring them back tomorrow morning and admonish them that they have all the evidence that they need and they are stuck with the evidence. . . ."

Even "accept[ing] completely" the second interpreter's translation "that it should be a man and a woman on the line in question," the trial court determined the question defense counsel asked about whether it is ever proper to reopen—which, as the prosecutor pointed out, case law says it is—was "not the question the court must ask." The court must ask the question in the context of "this case, in this state of the evidence, . . . . And was Judge Falcone in error by saying I am not going to allow them to do this further [sic]. [Y]ou didn't object at the time. . . ." "The real question now," accepting the phrase was "a man and a woman rather than a man, . . . what's the relevance of that and how does that affect the overall impact of the case."

The trial court summarized the state of the evidence as follows: Quinonez and his girlfriend were arrested, detectives advised him of his *Miranda* rights, he confessed to killing Ms. Enriquez, he exculpated his girlfriend and claimed she did not know about the plan to kill Ms. Enriquez. (*Miranda v. Arizona* (1966) 384 U.S. 436.) After she was advised of her *Miranda* rights, Quinonez's girlfriend admitted to witnessing the murder and said Quinonez had told her they were just going to steal a car. "Let's assume there

27

was an error there [in the translation of Enriquez's statement]. [¶] The problem is you have got overwhelming evidence here of the defendant's guilt, including by his own hand. [¶] Clearly, even if the victim did say a man and a woman, she's correctly referring to the fact there was a man and a woman in the car, if she was taken by these two people. . . ."

Accepting the "new translation [a]s contradictory to the translation of the interpreter at trial," the trial court determined: "I don't think it rises to a level to raise any doubt as to the integrity of the jury's verdict, considering the overwhelming other evidence, including evidence from the defendant's own mouth."

Defense counsel argued the shots came from the back at an angle, and Yolanda, who "received a six-year [sic, seven-year] prison sentence for her cooperation," testified she was in the back seat, closer to the left side rear, somewhere in the middle" and Quinonez was "on the far right." She "had her own problems[, s]he was a victim of abuse[,] she hooked up with Mr. Quinonez, lived with [him][,] and she testified that she would do anything for [him]." According to defense counsel, the jury found his argument that Yolanda's "motivation to get Mr. Quinonez to admit this was to get a six-year [sic, seven-year] sentence. And that was Mr. Quinonez's motivation insofar as his confession. [¶] But the jurors believed for some time anyway, the shooter very well could have been the female."

The trial court agreed that "[c]learly the shooter could have been the female or someone right-handed or someone in the passenger seat reaching across and still shooting . . . , but the evidence here is entirely consistent with the verdict."

The prosecutor responded that Quinonez's girlfriend Yolanda had not been offered anything in exchange for her testimony; she pled in juvenile court and was sentenced. She testified because she was subpoenaed to testify as a witness.

28

Accepting the defense contention Yolanda could have been the shooter, the trial court concluded the "evidence is otherwise" and added, "Quinonez'[s] own confession seals it as far as I'm concerned. [¶] The motion for new trial is denied."

## I. Quinonez Was Not Prejudiced by the Trial Court's Failure to Instruct the Jury Sua Sponte with CALCRIM No. 121.

Quinonez first argues the trial court erred by failing to instruct the jury sua sponte with a modified version of CALCRIM No. 121 to explain the jury's duties when receiving a transcript of an audio recording containing a foreign language translation prepared by an interpreter.[16] We disagree.

*Forfeiture.*

As a preliminary matter, we note that the Attorney General argues Quinonez forfeited this claim of err by failing to raise it in the trial court. It is true that to the extent a defendant argues certain instructions required further amplification or clarification, if the defendant did not seek such amplification or clarification at trial, we conclude that the claim is forfeited. (*People v. Lucas* (2014) 60 Cal.4th 153, 281, fn. 47, citing *People v. Moon* (2005) 37 Cal.4th 1, 29 [the "failure to seek 'amplification or explanation' of the instruction precludes relief on appeal"].) However, an instructional error affecting a defendant's right to a jury verdict based on the evidence is reviewable on appeal even absent an objection in the trial court. (See *People v. Hernandez* (2009) 180 Cal.App.4th 337, 348, quoting § 1259 [instructional error not forfeited where it affects defendant's

---

16     Quinonez says an appropriately modified version of CALCRIM No. 121 "might have read" as follows: "'The audio CD you are about to hear contains some words spoken in Spanish. In the transcript accompanying the recording, an interpreter has provided a translation for you. You must rely on the translation provided by the interpreter, even if you understand the language spoken in the recording. Do not translate any of the language in the recording for other jurors. *If you believe the court interpreter translated the language in the recording incorrectly, let me know immediately by writing a note* and giving it to the bailiff.' (Emphasis added [by Quinonez].)"

29

substantial rights]; *People v. Lucas, supra,* 60 Cal.4th at p. 281, fn. 47 [for claims of error challenging a given instruction more generally or as a whole, we review the claim "to the extent [the defendant's] substantial rights were affected"].)  We review such claims of instructional error de novo.  (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111 [a claim that a court failed to properly instruct on the applicable principles of law is reviewed de novo].)

       *CALCRIM No. 121 and the Applicable Law.*

       CALCRIM No. 121 ("Duty to Abide by Translation Provided in Court") instructs jurors that they must rely on the court interpreter's English translation of foreign language testimony, even if they understand the language spoken by the witness.[17]  The bench note recommends giving this instruction "whenever testimony will be received with the assistance of an interpreter, though no case has held that the court has a sua sponte duty to give [it]."  (Judicial Council of Cal. Crim. Jury Instns. (2014) Bench Notes to CALCRIM No. 121, p. 20.)  In 2014 (after Quinonez's trial in 2012), CALCRIM No. 121 was revised to include an alternative instruction for foreign language recordings, which requires jurors to rely on the transcript of the English language translation of the recording.[18]  Before the revision, the bench notes recommended using a similar Ninth

---

[17]    "<Alternative A--foreign language testimony>
"Some testimony may be given in _____ <insert name or description of language other than English>.  An interpreter will provide a translation for you at the time that the testimony is given.  You must rely on the translation provided by the interpreter, even if you understand the language spoken by the witness.  Do not retranslate any testimony for other jurors.  If you believe the court interpreter translated testimony incorrectly, let me know immediately by writing a note and giving it to the (clerk/bailiff)."  (CALCRIM No. 121 [foreign language testimony].)

[18]    "<Alternative B –foreign language recording>
"You (may/are about to) hear a recording [that is partially] in a foreign language.  You will receive a transcript with an English language translation of that recording.  [¶] You must rely on the transcript, even if you understand the language in the recording.  Do not share your own translation with other jurors.  Please write a note to the clerk or bailiff if you believe the translation is wrong.  [If the recording is partially in English, the English

Circuit model jury instruction in that situation.[19]  (Ninth Circuit Manual of Model Criminal Jury Instructions (2010) Criminal Cases, Jury Instruction No. 2.8 [requiring jurors to accept transcript of official English-language translation of recording]; Judicial Council of Cal. Crim. Jury Instns. (2012) Bench Notes to CALCRIM No. 121, p. 22.)

A recording in English normally constitutes the evidence of what was said, and a transcript of the recording is used only as an aid in following and understanding the recording.  If the recording and the transcript conflict, the recording controls.  (*People v. Brown* (1990) 225 Cal.App.3d 585, 598–599 (*Brown*).)  However, when the recording is in a foreign language, the English translation controls and is the evidence of what was said.  (*People v. Cabrera* (1991) 230 Cal.App.3d 300, 304 (*Cabrera*).)  Any other rule would be "nonsensical" and have "the potential for harm where the jury includes bilingual jurors."  (*U.S. v. Fuentes-Montijo* (9th Cir. 1995) 68 F.3d 352, 355-356; accord, *Cabrera, supra,* 230 Cal.App.3d at pp. 303-304.)

*Analysis.*

"The proper test for judging the adequacy of instructions is to decide whether the trial court 'fully and fairly instructed on the applicable law . . . .  [Citation.]"  (*People v. Martin, supra,* 78 Cal.App.4th at p. 1111.)  We consider the instructions as a whole, assume jurors are intelligent and capable of understanding and correlating all jury instructions given and interpret these instructions "'so as to support the judgment rather

---

parts of the recording are the evidence.]"  (CALCRIM No. 121 [foreign language recording].)

[19]  The Ninth Circuit's model criminal instruction 2.8 provided:  "You are about to [hear] [watch] a recording in the [specify the foreign language] language.  A transcript of the recording has been admitted into evidence.  The transcript is an official English-language translation of the recording.  [¶] Although some of you may know the [specify the foreign language] language, it is important that all jurors consider the same evidence. Therefore, you must accept the English translation contained in the transcript even if you would translate it differently."  (9th Cir. Crim. Jury Instns. (2010) Instn. No. 2.8; Judicial Council of Cal., Crim. Jury Instns. (2011) Bench Notes to CALCRIM No. 121, p. 22.)

than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*Id.* at pp. 1111-1112.)

Here, although the trial court did not instruct the jury using CALCRIM No. 121, at the time the prosecution's first witness testified through a Spanish interpreter, the trial court instructed the jury (after confirming there were Spanish speakers on the jury): "Those of you who speak Spanish must accept the interpretation given by a certified interpreter, not put your own spin on what the witness has testified about in Spanish. We have to rely on the court[-]certified interpreter. [¶] Does everybody understand that?" The jurors responded in the affirmative. When the prosecutor passed out transcripts before playing Enriquez's recorded statement for the jury, the prosecutor called attention to the fact there were two columns in the transcript—the Spanish transcription on the left and the "English translation from a certified Spanish interpreter" on the right. Later, when the trial court formally instructed the jury, the jurors received CALJIC Nos. 1.00 [respective duties of judge and jury]) and 1.03 which reiterated that "[w]hen a witness has testified through a Certified Court Interpreter, you must accept the English interpretation of that testimony even if you would have translated the foreign language differently. . . ." When the jury raised a question as to the accuracy of the translation contained in the transcript of Enriquez's statement, the trial court reiterated these same instructions, confirming the transcript and translation had been prepared by a "certified court interpreter" and indicating the jury was bound to follow this instruction and accept the translation of the court certified interpreter.

By instructing bilingual jurors not to rely on their own understanding of a witness's testimony or recording if they disagree with the certified translation, CALCRIM No. 121 ensures that a defendant is convicted only on evidence presented at trial. (See *Cabrera, supra,* 230 Cal.App.3d at pp. 303-304 [juror committed misconduct in relying on and sharing her own translation of testimony with other jurors]; see also *U.S. v. Fuentes—Montijo* (9th Cir. 1995) 68 F.3d 352, 355-356 [restrictions on bilingual

jurors may be "essential" where translation is disputed].)  In this case, the trial court similarly emphasized the importance of the court-certified translation and thus "fully and fairly communicated" to the jury the applicable law that, when testimony (including recorded testimony) is in a foreign language, the English translation controls and is the evidence of what was said.  (*Cabrera, supra,* 230 Cal.App.3d at p. 304; *People v. Posey* (2004) 32 Cal.4th 193, 218.)  The trial court did not err in this respect.

To the extent Quinonez objects that CALJIC No. 103 did not distinguish foreign language testimony from foreign language recordings or that the further language about informing the bailiff if an error is noted in a translation was not included in this jury's instructions, he has identified no authority for the proposition that such language is mandatory.  Indeed, this language was not incorporated into CALCRIM No. 121 until 2014.  While it may be the better practice to include such a request to forestall issues like the ones Quinonez raises here, (see *Cabrera, supra,* 230 Cal.App.3d at pp. 303-304 [it is misconduct for a juror to translate for other jurors testimony that has been translated by the court-appointed interpreter; "[i]f [the juror] believed the court interpreter was translating incorrectly, the proper action would have been to call the matter to the trial court's attention, not take it upon herself to provide her fellow jurors with the 'correct' translation"]), this claim of error is in the nature of a request for amplification or clarification, rather than a failure to instruct the jury on the applicable law.[20]  (*People v. Kelly* (1992) 1 Cal.4th 495, 535, citation omitted ["'The trial court cannot reasonably be expected to attempt to revise or improve accepted and correct jury instructions absent some request from counsel'"].)  Because Quinonez failed to request such amplification or

---

[20]   Similarly, regarding Quinonez's objection to the *timing* of the trial court' s instructions, we note the Judicial Council's Bench Notes to CALCRIM No. 121 state Alternative A (foreign language testimony) may be given at the beginning of the case, when the person requiring translation testifies, or both, at the court's discretion. Likewise, Alternative B (foreign language recording) may be modified and given again at the end of the case, with all other instructions.

33

clarification, he forfeited the issue. (*Id.* at p. 536; see *People v. McKinnon* (2011) 52 Cal.4th 610, 670 ["a defendant who believes an instruction requires clarification or modification must request it"].) Furthermore, notwithstanding the absence of this further instruction, the jury *did* proceed as CALCRIM No. 121 would have instructed—by calling the matter to the trial court's attention during its deliberations. As a result, even if jurors did not understand the same rule applicable to foreign language testimony applied to a foreign language recording from the outset, in addressing the jury when the perceived discrepancy arose, the trial court confirmed the rule was the same.[21] "We 'credit jurors with intelligence and common sense' . . . and presume they generally understand and follow [the trial court's] instructions . . . ." (*People v. McKinnon, supra,* 52 Cal.4th at p. 670, citations omitted.)

In any event, even assuming Quinonez had been able to establish error in the trial court's failure to instruct the jury sua sponte with CALCRIM No. 121, it is not reasonably probable Quinonez would have obtained a more favorable outcome had the instruction been given. (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1054-1055; *People v. Watson* (1956) 46 Cal.2d 818, 836.) As we have explained, while the jurors were not instructed with the exact words of CALCRIM No. 121, they nevertheless received the substance of that instruction through CALJIC Nos. 1.00 and 1.03, the trial

---

[21] On this record, it is not even clear that the inclusion of the language about giving a note to the bailiff in the event of an error in the translation would have made any difference in the timing of the jury's notification because it is not clear any of the jurors perceived any error at the time the audio recording of Enriquez's statement was played during the trial. Indeed, Officer Perez, a fluent Spanish speaker certified by the Department, listened to the playback at trial and, during cross examination, confirmed the certified translation accurately reflected the Spanish spoken on the audio recording, and no issue arose at that time. However, in the prosecutor's closing argument and rebuttal, she indicated that, in addition to Quinonez's and Yolanda's accounts, Enriquez also identified the shooter as a man; the jury then asked to hear this audio again and notified the trial court of the apparent disparity at that time. Consequently, even if the jury had been instructed with CALCRIM No. 121 at the time of the audio playback during trial, the jury's question may not have arisen until the jury's deliberations anyway.

court's instruction at the time of Schopp's testimony through a Spanish interpreter and the court's further instructions at the time the accuracy of the translated line from Enriquez's recorded statement came into question. The only line missing from CALCRIM No. 121 was the instruction: "Do not share your own translation with other jurors."

While the non-Spanish speaking jurors did learn of the Spanish speakers' translation under the circumstances presented in this case, the trial court nevertheless made clear the jury's obligation to disregard the Spanish-speaking jurors' translation and to accept the certified interpreter's translation. (*People v. McKinnon, supra,* 52 Cal.4th at p. 670.) Moreover, Quinonez had confessed to the crime (describing in detail how he had planned its commission, why he claimed he had no choice but to kill Enriquez, how he had second thoughts when he looked into Enriquez's eyes and apologized to her but then shot her anyway and how he had worked to destroy the evidence against him). Quinonez's girlfriend Yolanda also identified him as the shooter and testified in a manner consistent with Quinonez's confession. It follows that the failure to give CALCRIM No. 121 does not require reversal of Quinonez's conviction. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

## II. In the Absence of a Request from Defense Counsel, the Trial Court Had No Duty to Reopen the Trial, and Quinonez Was Not Prejudiced in any Event.

Quinonez argues the trial court denied him his constitutional rights to a fair jury trial and due process of law "by failing to exercise its discretion sua sponte to reopen the trial once the jury informed it of the translation error." We disagree.

*Forfeiture.*

Quinonez acknowledges "it does not appear any California case has specifically declared the existence of a sua sponte duty to reopen during jury deliberations" but suggests "this may only mean the instant case is one of first impression." Then, citing *People v. Caro* (1988) 46 Cal.3d 1035, 1046, he notes the Supreme Court held that "trial

courts do *not* have a sua sponte duty to reopen jury selection, but the case does not provide any meaningful guidance in the instant context." (Italics added.) This case provides no support for Quinonez's position as our Supreme Court determined the defendant in Caro—who had raised no objection to the jury selection process—"may not be heard to complain" because there was "no indication [he] was in any way dissatisfied with the panel as it was constituted." (*Id.* at p. 1047.) To the contrary, defense counsel had stipulated to the procedure. (*Ibid.*)

Similarly, when the trial court in this case stated, "I'm not going to provide another interpreter for additional evidence," defense counsel responded, "I don't think you can[,]" and when the prosecutor asked the trial court to remind the jury a certified court interpreter had provided the transcription and translation, defense counsel, specifically stated, "I don't have any objections; not to that."[22] It follows that Quinonez "may not be heard to complain" either given his acquiescence. (See *Caro, supra,* 46 Cal.3d at p. 1047; see also *People v. Young* (2007) 156 Cal.App.4th 1165, 1171 [defendant's failure to object to having case reopened to present additional closing argument to jury forfeited the issue on appeal]; *People v. Jennings* (1991) 53 Cal.3d 334, 383-384 [failure to object or move for mistrial based on trial court's ex parte communication with jury precluded assertion of error on appeal; potential significance of the error was slight]; *People v. Bishop* (1996) 44 Cal.App.4th 220, 235 [by failing to request additional argument when trial court stated its intention to instruct the jury they could find appellant guilty of special circumstance allegation on an aiding and abetting theory, appellant waived the objection]; 6 Witkin & Epstein, Cal. Criminal Law (4th ed.

---

[22] Later, at the hearing on Quinonez's motion for new trial, when defense counsel initially said he thought he had asked the trial court about reopening during an unreported exchange, the prosecutor contradicted his account, indicating there was only the reported proceedings regarding the interpreter and the response to give the jury; "[t]here was no discussi[on] regarding reopening," and defense counsel deferred to her recollection.

2012) Reversible Error, § 41, p. 571, and citations therein [defendant who did not induce error "may nevertheless, by conduct amounting to acquiescence in the action taken, forfeit the right to attack it[; t]his is true even though the defendant does not affirmatively show acquiescence, but merely fails to object" in the trial court].)

*Applicable Law.*

Even if this claim had not been forfeited, it would fail. "The trial court has authority to order a case reopened for good cause even after jury deliberations have begun." (*People v. Green* (1980) 27 Cal.3d 1, 42 (*Green*), overruled on other grounds as stated in *People v. Dominguez* (2006) 39 Cal.4th 1141, 1155, fn. 8, and *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3; *People v. Jones* (2003) 30 Cal.4th 1084, 1110; *People v. Riley* (2010) 185 Cal.App.4th 754, 764 ["Courts have interpreted [Penal Code] sections 1093 and 1094 as giving a trial court 'broad discretion to order a case reopened and [to] allow the introduction of additional evidence [citations]'"]; *People v. Goss* (1992) 7 Cal.App.4th 702, 706 ["It is well settled that the trial court has broad discretion to order a case reopened . . . ."].) "[T]he decision to grant or deny a motion to reopen remains in the discretion of the trial court." (*Green, supra,* 27 Cal.3d at p. 42; Pen. Code, §§ 1093 [order of proceedings], 1094 ["for good reasons, and in the sound discretion of the court, the order prescribed in Section 1093 may be departed from"].)

"In determining whether a trial court has abused its discretion in denying a defense request to reopen, the reviewing court considers the following factors: '(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.' [Citation.]" (*People v. Jones, supra,* 30 Cal.4th at p. 1110.) However, as stated in *Green,* where the trial court "simply did not exercise its discretion *upon defendant's motion* . . . the error lay in its failure to do so," and, in that case, the only question before a reviewing court is

whether the error resulted in a miscarriage of justice. (*Green, supra,* 27 Cal.3d at p. 42, italics added; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

*Analysis.*

Quinonez argues a result more favorable to him was reasonably probable had the trial court reopened the case because, as demonstrated by his motion for new trial, "the opportunity to obtain a translation from a second certified court interpreter would have produced evidence supporting the jurors' view of the correct translation of the disputed phrase." Under such circumstances, paraphrasing *People v. Newton* (1970) 8 Cal.App.3d 359, 384, he argues, the second translation would have allowed the jury "'to consider the possibility, however remote, that someone other than he . . . had fired the fatal [shots],'" and he might have obtained a hung jury. "Except for this evidence," he says, "the People did not present anything else which tied Quinonez to the homicide without similarly and equally incriminating Yolanda." He mischaracterizes the record in this case.

Both Quinonez and Yolanda said Quinonez had shot Enriquez. Relying on the criminalist's inability to say with certainty where the shooter had been sitting in the back of Enriquez's car and the evidence of Quinonez's love for Yolanda, defense counsel argued that Yolanda could have been the shooter and Quinonez could have been "taking the rap" for her. As the jury heard, however, Yolanda was 14, and she had known Quinonez for three months. Quinonez was a 20-year-old validated Florencia 13 gang member, and he did not merely confess to the crime; he described it in detail during an interview lasting nearly three hours. Only after detectives told him Enriquez had lived long enough to speak to the police and all of the evidence pointed to him as Enriquez's killer but the circumstances of why he had killed her could make a difference under the law, Quinonez said he had been sent on "mission" to execute the "hit" on Enriquez because she had been "talking" and, because his own name had been placed on "the list" as a suspected "snitch," he had no choice but to kill her or be killed himself. He explained how he had to be the one to do it because of the "connection" he already had to

38

her.  According to Quinonez himself, he was the one who had been given the gun, the instructions of what had to be done before and after Enriquez was killed and the deadline by which the "mission" had be completed.  Not only that, but he detailed how he rolled down the window to let the wind make noise, looked in Enriquez's eyes which made him not want to do it and apologized to her but shot her multiple times anyway.  He "sw[o]r[e]" it was a "hit" and "put it on [his] mom, [his] little brother" and "on everything [he] love[d]."  Defense counsel argued this was part of the "gang 'code of conduct.'"  "You don't make this kind of statement unless you're telling the truth."

Furthermore, even if the jury had been presented with the second translation rather than the first, (meaning the disputed initial line from Enriquez's statement was understood as "A man and a woman!" instead of "It was a man, it was a man"), the remainder of both versions of the translated statement still referred to "the people," "they" and "them"—the two people Enriquez told Officer Perez had asked her for a ride—entirely consistent with Quinonez's statement to the police as well as Yolanda's testimony.  In fact, at a different point in the transcription, where the first interpreter transcribed Enriquez's statement as "They don't know me," the second interpreter transcribed her response as "I don't know *him*."[23]  (Italics added.)

Assuming arguendo defense counsel had asked to reopen the case in an unreported exchange, the trial court would not have abused its discretion in denying the request given the insignificance of the evidence in the context of this record.  (*People v. Newton, supra*, 8 Cal.App.3d at p. 383 [factors to be considered in reviewing the trial court's exercise of discretion include the significance of the evidence].)  Even assuming

---

[23]    Indeed, although the jury only heard the excerpts of Enriquez's statements quoted in this opinion, the record includes the full transcription of Enriquez's entire statement recorded by Officer Perez.  In that full version, it is clear that she specifies there were "[t]wo"—a male and female who were on foot when they asked her for a ride and she generally uses plural pronouns, but where she is specific, her apparent focus is on the male; she says she "didn't see a [sic, the?] woman," then says it was the male who "hit" her and tells Officer Perez "I don't know that man."

39

arguendo the trial court instead failed to exercise its discretion upon a proper defense motion to reopen the case on the mistaken belief the court lacked jurisdiction to do so, on the record before us, we would find the error to be nonprejudicial, just as in *Green,* as it is not reasonably probable Quinonez would have obtained a more favorable result had the case been reopened to allow the admission of a second translation like the one later submitted in support of Quinonez's motion for new trial. (*Green, supra,* 27 Cal.3d 42-44, citing *People v. Watson, supra,* 46 Cal.2d at p. 836 [failure to exercise discretion to reopen was error, but error was nonprejudicial on the record presented].)

## III. The Trial Court Did Not Err in Failing to Declare A Mistrial Based on Jury Misconduct.

As an alternative to reopening the trial, Quinonez argues the trial court "abused its discretion by failing to exercise its inherent power to declare a mistrial upon discovering the jurors had committed actual misconduct by violating their oath to adhere to its instructions. (*People v. Cabrera, supra,* 230 Cal.App.3d at p. 303 [it is misconduct for a juror to retranslate for other jurors testimony translated by court-appointed interpreter]; *People v. Engelman* (2002) 28 Cal.4th 436, 443 [refusal to apply the law as instructed by the court during deliberations may constitute a ground for discharge of a juror].) We disagree.

*Forfeiture*.

Because Quinonez did not object or request a mistrial based on juror misconduct, he forfeited such claim of error on appeal. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1308 [defense counsel's failure to object to juror's continued service or request mistrial on ground of juror misconduct forfeits claim on appeal]; *People v. Stanley* (2006) 39 Cal.4th 913, 950 [even where jury misconduct is evident and gives rise to rebuttable presumption of prejudice, defense counsel's failure to object to juror's continued service or to request a mistrial based on jury misconduct waives claim of error on appeal].)

40

*Applicable Law and Analysis.*

Even if the claim had not been forfeited, it would fail. As our Supreme Court recently stated in *People v. Lavender* (Dec. 8, 2014, S209975) ___ Cal.4th ___ [2014 Cal. LEXIS 11034, *24] (*Lavender*), "When we talk about jury deliberations, we are talking about the conduct of human beings who are fallible. 'It's a rare jury trial in which there are no mistakes on anyone's part.' [Citation.] 'To demand theoretical perfection from every juror during the course of a trial is unrealistic.' [Citation.]" Accordingly, the presumption of prejudice resulting from jury misconduct may be rebutted by a reviewing court's determination, upon an examination of the entire record, that there is no substantial likelihood the complaining party suffered actual harm. (*Lavender, supra*, ___ Cal.4th ___ [2014 Cal. LEXIS 11034, *14, *17 [addressing the question of whether prejudice from jury misconduct had been rebutted where, during deliberations, one or more jurors had discussed the defendants' decisions not to testify; "a reminder to the jury of the court's instructions to disregard a defendant's decision not to testify is, in the absence of objective evidence establishing a basis to question the effectiveness of the reminder (see Evid. Code, § 1150), strong evidence that prejudice does not exist"]; *People v. Lewis, supra,* 46 Cal.4th at p. 1309; *People v. Nesler* (1997) 16 Cal.4th 561, 582.)

In this case, in response to the jury's first note requesting a translator, the audio recording and copies of the transcript for each juror, the trial court responded by telling the jury: "You were instructed to accept the translation reflected in the transcript. No translator will be provided. Those who speak Spanish must still accept the translation reflected in the transcript." Notwithstanding this instruction, the jury submitted another note pointing out the specific line Spanish-speaking jurors believed had been mistranslated, and the trial court commented, "What bothers me is that they ignored my instruction that they had to accept it."

41

As a result, the trial court, determined to be "more firm," reminded the jurors they had been instructed they had to determine the facts from the evidence presented at trial and not from any other source; they had to follow the law as stated by the trial court regardless of whether they agreed with it; and when a witness testified through a certified court interpreter, they had to accept the English interpretation of that testimony even if they would have translated the foreign language differently.[24] In addition, the trial court also explained that to become certified, interpreters have to take proficiency tests to demonstrate their ability and also had to give an oath to translate truthfully. Moreover, the trial court emphasized that both the prosecution and defense had a long period of access to the audio recording and transcript in its entirety, and the jury had only heard the relevant portion—which "had been approved by both sides" without any objection—so that was "the evidence of [Enriquez]'s statement, period." Accepting a different translation, the trial court told jurors, would be "contrary to your oath," "contrary to the law" and "contrary to my instructions." After that, the trial court inquired whether "[a]nybody fe[lt] they c[ould no]t follow [the trial court's] instructions," and then stated for the record, there was no showing of hands.

Citing *People v. Thomas* (2012) 53 Cal.4th 771, 819, Quinonez argues "it certainly appears the 'extraneous material'"—the Spanish-speaking jurors' translation—was "inherently and substantially likely to have influenced" those jurors. In *People v. Thomas,* our Supreme Court explained: "When juror misconduct involves the receipt of information from extraneous sources, a substantial likelihood of juror bias 'can appear in two different ways. First, we will find bias if the extraneous material, judged objectively,

---

[24] In *People v. Keenan* (1988) 46 Cal.3d 478, 532, our Supreme Court held that the court had a duty to investigate an allegation of juror misconduct, emphasizing that "when a trial court learns during deliberations of a jury-room problem which, if unattended, might later require the granting of a mistrial or new trial motion, the court may and should intervene promptly to nip the problem in the bud. The law is clear, for example, that the court must investigate reports of juror misconduct to determine whether cause exists to replace an offending juror with a substitute."

42

is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.]' [Citation.]" (*Ibid.*) "'In an extraneous-information case, the "entire record" logically bearing on a circumstantial finding of likely bias includes the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant.' [Citation.]" (*Ibid.*)

Here, the record establishes no reasonable likelihood any juror was improperly influenced by the Spanish-speaking jurors' report of the apparent mistranslation. (See *Lavender, supra,* ___ Cal.4th ___ [2014 Cal. LEXIS 11034, *24] ["to assume that jurors who wade into a forbidden topic in the course of deliberations can never be put right again by a reminder from the trial judge . . . sets an unreasonably high bar for jury conduct"].) In arguing "there is a reasonable chance he would have attained a more favorable result" had the trial court declared a mistrial as he would have been able to use the "corrected translation" he later submitted in support of his new trial motion in a retrial, Quinonez necessarily acknowledges that the Spanish-speaking jurors' translation of the disputed line was *favorable* to him—not "inherently and substantially likely to have influenced" the jury to his detriment. (*People v. Thomas, supra,* 53 Cal.4th at p. 819.) Furthermore, looking to the nature of the misconduct and surrounding circumstances (*ibid.*), the record in this case establishes no reasonable likelihood any juror was actually biased against Quinonez as a result. (*Ibid.*) To the contrary, the jurors' actions demonstrate their concern that the Spanish-speaking jurors' translation was not only the correct translation but that it could *assist* Quinonez's defense and that, in spite of these circumstances, they were being instructed they could not consider it.

Once the trial court explained the defense had had access to the audio recording and transcription for a long time before trial, the recording and transcription were actually

longer than what was played for the jury and both sides had agreed to the jury's receipt of the redacted version without objection, the jurors indicated they were able to follow the trial court's instruction to accept the court-certified translation and reached their verdict. Based on our review of the record, including Quinonez's nearly-three-hour statement to police in which he confessed to the crime in great detail along with Yolanda's entirely consistent statement as well as the full version of Enriquez's statement to Officer Perez, there is no substantial likelihood Quinonez suffered actual harm as a result of the trial court's failure to declare a mistrial. (*People v. Thomas, supra,* 53 Cal.4th at p. 819, citation omitted ["'presumption of prejudice [from jury misconduct] may be rebutted . . . by a reviewing court's determination, *upon examining the entire record,* that there is no substantial likelihood that the complaining party suffered actual harm'"]; *People v. Nesler, supra,* 16 Cal.4th at p. 580-581, citation omitted [in considering the effect of misconduct upon defendant's right to a trial by 12 impartial jurors, for federal constitutional purposes, "'[i]t is sufficient if the juror can lay aside his impression or opinion *and render a verdict based on the evidence presented in court*"].) Because we conclude the trial court did not err in failing to declare a mistrial based on jury misconduct, reversal is not warranted under either the harmless error or reasonable probability standards Quinonez urges. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson, supra,* 46 Cal.2d 818, 836.)

## IV. The Trial Court Did Not Coerce the Jury's Verdict.

Citing *People v. Rodriquez* (1986) 42 Cal.3d 730, Quinonez argues his conviction must be reversed because the trial court's remarks, "even if made in the context of instructing the jury rather than commenting on the evidence, were likely to have 'effectively control[led] the verdict.'" (*Id.* at p. 768 ["we have made clear that the trial court has broad latitude in fair commentary, so long as it does not effectively control the verdict"].) "'Any claim that the jury was pressured into reaching a verdict depends on

the particular circumstances of the case.'" (*People v. Russell* (2010) 50 Cal.4th 1228, 1252.)

It appears the trial court's stated intention to be "rather firm" with the jury was based on the mistaken belief the court had already specifically instructed the jury regarding a recording in foreign language. Nevertheless, even assuming the trial court was unduly harsh in its subsequent admonitions to the jury, the trial court correctly instructed the jury it was obligated to accept the court-certified interpreter's translation of Enriquez's statement. (Compare *People v. Smith* (2004) 32 Cal.4th 792, 801, italics added [where jury took only 20 minutes to transform a seven-to-five deadlock into a unanimous guilty verdict, it "'blinks reality to deny that the *erroneous* instruction was the key to resolving the jury's impasse'"] with *People v. Russell, supra,* 50 Cal.4th at p. 1252 [where court did not suggest it favored any particular verdict or inquire as to the voting and "did not constrain . . . the jury except to require that the jury abide by the instructions given," court's instruction cannot be construed as coercive].) After receiving the further assurance that the excerpts were part of a lengthier statement and the defense had no objection to the translation as it stood, the jury was quick to reach its verdict. However, because we do not view the trial court's comments or the single disputed line in isolation but rather in the particular circumstances of this case, we do not view the trial court's instructions as improperly coercive of a guilty verdict. (*People v. Russell, supra,* 50 Cal.4th at p. 1252; and see 6 Witkin & Epstein, California Criminal Law (4th ed. 2012) § 41, p. 69 ["Perhaps it can be said, somewhat loosely, that coercion to reach a verdict is countenanced so long as it is not coercion to reach a verdict of guilty"]

**V. The Trial Court Did Not Abuse its Discretion in Denying Quinonez's Motion for New Trial.**

*Applicable Law.*

The authority to grant a defendant a new trial is found in Code of Civil Procedure section 1181. Quinonez moved for a new trial citing subdivision 8 of section 1181,

which states that the trial court may grant a new trial: "When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all circumstances of the case, may seem reasonable."

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: '"1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits."'" (*People v. Delgado* (1993) 5 Cal.4th 312, 328, citations omitted.) "The focus of the trial court, however, should be on the significance and impact of the newly discovered evidence, not upon the failings of counsel or whether counsel's lack of diligence was so unjustifiable that it fell below constitutional standards." (*People v. Martinez* (1984) 36 Cal.3d 816, 826 (*Martinez*). In *Martinez,* although the trial court reasonably could have found defense counsel had failed to use reasonable diligence to obtain the allegedly newly discovered evidence, our Supreme Court concluded the trial court had abused its discretion in denying the defendant's motion for a new trial because it determined the evidence on which it was based "would probably lead to a different result at retrial. Reliance upon counsel's lack of diligence to bar defendant from presenting that evidence to a trier of fact would work a manifest miscarriage of justice."[25] (*Id.* at pp. 825-826.)

---

[25]    In *People v.* S*oojian* (2010) 190 Cal.App.4th 491, the court observed that "the cases that have discussed the application of *Martinez* have focused on the weakness of

46

"'The granting or denial of a motion for a new trial on the ground of newly discovered evidence is a matter within the sound discretion of the trial court, and in determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background. [Citation.]' [Citation.]" (*People v. Dyer* (1988) 45 Cal.3d 26, 52.)

Here, the trial court properly focused on the significance of the second transcription of Enriquez's statement to Officer Perez as interpreted by a different court-certified interpreter and its "overall impact o[n] the case." "Clearly," the trial court observed, "even if the victim did say [']a man and a woman[,']she's correctly referring to the fact there was a man and a woman in the car," given the evidence "she was taken by these two people . . . ." As the trial court stated, the second translation was "entirely consistent with the verdict" and did not "rise[] to a level to raise any doubt as to the integrity of the jury's verdict, considering the overwhelming other evidence, including evidence from the defendant's own mouth," adding "Quinonez'[s] own confession seals it as far as I'm concerned."

Leaving to one side the issues of whether the evidence (rather than its materiality) was newly discovered and whether Quinonez, with the exercise of reasonable diligence, could have discovered and presented it at trial, we find the trial court did not abuse its discretion in denying the motion for new trial. Even if Enriquez's initial statement was actually "a man and a woman!" and not "[i]t was a man, it was a man," such evidence did not constitute evidence that would "render a different result probable on a retrial of the cause." (*People v. Delgado*, *supra*, 5 Cal.4th at p. 328, citations omitted; *People v.*

---

the prosecution's case, whether the new evidence directly contradicted the prosecution's strongest evidence against the defendant, and the likelihood that reversal would have been required utilizing an ineffective assistance of counsel analysis. While we are not certain whether any of these factors must be present, we are certain that each case must stand on its own facts, and no bright line can be drawn to permit easy resolution of this issue." (*Id.* at p. 518.)

*McDaniel* (1976) 16 Cal.3d 156, 179 ["A motion for a new trial on newly discovered evidence is looked upon with disfavor, and unless a clear abuse of discretion is shown, a denial of the motion will not be interfered with on appeal"].)

## VI. The Trial Court Did Not Err in Denying Quinonez's Motion for New Trial on the Non-Statutory Ground an Incorrect Translation Deprived Him of a Fair Trial.

Quinonez based his motion for new trial on the additional non-statutory ground that an incorrect translation deprived him of a fair trial; in this regard, he says he "essentially reiterates" his argument the trial court erred by not reopening the trial. Consequently, this argument fails for the same reasons addressed in section II of our discussion. Quinonez forfeited any error in this regard; even leaving to one side this forfeiture, he has failed to demonstrate error as well as prejudice in any event. (See *Brown, supra,* 225 Cal.App.3d at p. 599 ["Transcripts of admissible tape recordings are only prejudicial if it is shown they are so inaccurate that the jury might be misled into convicting an innocent man"]; *Cabrera, supra,* 230 Cal.App.3d at pp. 304-305.) Quinonez admitted he shot Enriquez in his detailed police interview, and all of the other evidence was consistent with his confession.

### *DISPOSITION*

The judgment is affirmed.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**                    **SEGAL, J.**[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.